**People of the State of Illinois, Plaintiff-Appellee, v. John House, Defendant-Appellant.**

**Gen. No. 50,916.**

First District, Fourth Division.

July 22, 1966.

Stradford, Lafontant, Fisher & Corrigan, of Chicago (Jewel Lafontant, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and George Samels, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

## CHARGE: Murder.*

* Ill Rev Stats 1961, ch 38, § 358 [Criminal Code of 1874, in effect when the killing occurred on June 14, 1961]:

**Murder.**] § 140. Murder is the unlawful killing of a human being, in the peace of the people, with malice aforethought, either expressed or implied. . . . Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

Ill Rev Stats 1961, ch 38, § 366:

**Justifiable homicide.**] § 148. Justifiable homicide is the killing of a human being in necessary self-defense, or in the defense of habitation, property or person, against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, robbery, burglary and the like, upon either person or property, or against any person or persons who manifestly intend and endeavor, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein. A bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge.

Ill Rev Stats 1961, ch 38, § 367:

**Self-defense.**] § 149. If a person kill another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear also, that the person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given.

Ill Rev Stats 1961, ch 38, § 360:

**Murder—Punishment.**] § 142. Whoever is guilty of murder, shall suffer the punishment of death, or imprisonment in the penitentiary for his natural life, or for a term not less than fourteen years. If the accused is found guilty by a jury, they shall fix the punishment by their verdict; . . .

**JUDGMENT:** The jury found the defendant guilty of murder and fixed his punishment at thirty-five years.

**POINTS RAISED ON APPEAL:**

(1) It was error for the trial court to deny continuance requested by the Public Defender.

(2) It was error for the court to permit the jury to determine the defendant's punishment when the new Code of Criminal Procedure provides that the judge fix sentence and such Code was in effect at the time of trial.

(3) The evidence was not sufficient to show that the defendant shot the deceased with malice aforethought.

**EVIDENCE. Testimony of State Witnesses:**

*Mrs. Gertrude Jones.* She had seen her son, the deceased, at the morgue. On the day of the shooting he arose at 9:30 a. m., and stayed home until 2:00 p. m. He returned home for about 15 minutes around 5:00 p. m. He seemed sober at these times, and she had not seen him drinking that day.

*William Robinson* and *Robert Brent.* These witnesses testified to substantially the same facts. Robinson was a customer and Brent was the manager of the Normal Pool Hall, located at 438 East 63rd Street, Chicago. The deceased, Willie Jones, had been playing pool there the afternoon of June 14, 1961, and again that same evening. About 10:30 p. m. the defendant came in, wanted to play pool, laid a pool cue stick on the table at which Jones was playing, and when Jones tried to remove the stick, the defendant held the stick down on the table. Jones told the defendant not to "mess around" and called him a crazy son of a bitch, and added, "Otherwise I will kill you." Brent testified that he had warned the defendant that fighting was not allowed in the pool hall. Defendant backed away from Jones and warned him, "You don't threaten me, you greasy so and so." Defendant then left. Jones continued playing pool with one "Kilroy." About 20 minutes later defendant returned with a gun

347

in his possession. The occupants, numbering about 25, began to "dash about," trying to get out of the way. The defendant went up to Jones, and Brent went toward defendant and said, "House, don't do that in here." House told Brent to go on back, then began hitting Jones on the head with the gun. Jones did not hit the defendant, but tried to keep from being hit, and moved back along the row of pool tables until, at the fifth and final table, when Jones was hit the fourth time, the gun went off once. House then walked out of the door, the gun still in his hand. Jones twisted around, sat down on some cases of soft drink bottles, and collapsed. The police arrived about ten minutes later. Both Brent and Robinson had been about 10 or 20 feet away from the altercation; they both testified that the defendant had been whipping Jones with the barrel of the gun—a .45 caliber automatic. There were some minor discrepancies in the testimony of these two eyewitnesses; for example, they differed as to whether all five pool tables were in use at the time defendant initially intimidated Jones; whether defendant ran or walked after the shot went off; whether Jones had finished his game and was playing out the remainder of the time he had paid for, or if he was in the middle of the game. Since the trial occurred more than two years after the shooting it is to be expected that there would be some discrepancies in the testimony. Robinson testified that no liquor was served in the pool hall, that he had not smelled any liquor on Jones' breath, that he and Jones had not been drinking together. Brent testified that he was in the washroom when House returned, but that he immediately went out when he heard a commotion; that Jones was over six feet tall, and weighed 200 pounds. Both witnesses had previously seen Jones and House around the poolroom over a period of time.

*Hubert Harnois.* Police Officer Harnois was assigned to a squad car in the Englewood District of Chicago. On the night of June 14, 1961, he received a radio dis-

patch to go to the Normal Pool Hall, and he arrived there about 11:12 p. m. He described the premises for the court: there was a center entrance to a rectangular store, and there were about five pool tables down the center of the store; there was an adjoining room to one side; and soft drink equipment and bottles were in the rear of the store. He found the body of the deceased in the rear of the store, lying face up, with arms and legs outstretched, over a stack of soft drink bottles. Between the second and third pool tables he found one expended cartridge case. The body was located about six or seven feet further away from the last table.

*Claude Andersen,* a Chicago Police Department detective, arrested the defendant pursuant to warrant in Los Angeles, California, on February 7, 1963. He was accompanied at that time by another detective. They brought the defendant back to Chicago by commercial air transport. During the trip back Andersen and the defendant conversed, and the defendant (according to Andersen's testimony) said the deceased had been shooting pool and losing, and that the deceased's partner had refused to play any longer even though the deceased wanted to "get even." Defendant then walked to the table and put his cue stick there, whereupon the deceased objected to defendant's taking the table. An argument ensued, and the deceased said, "Get off me, or I'll kill you." House said, "How can you kill me? You have no weapon." House had also told Andersen that he then pulled a .45 caliber pistol from his pocket and slapped Jones on the side of the head with it; that the gun went off; that he knew he had shot Jones; that he then left the poolroom, went home, packed, and left the following day for Los Angeles. Andersen identified People's Exhibit One—the .45 caliber gun—as the one which had been turned over to him by the Los Angeles Police Department on the day he arrested the defendant. Andersen told the court that the defendant had at

349

that time admitted that it was the gun the defendant had used to shoot the deceased. It was brought out on cross-examination that the defendant had turned himself in voluntarily in Los Angeles. Detective Andersen did not know if defendant was involved with any other charge in California.

*Dr. Eugene Tapia.* As Coroner's Pathologist for Cook County, Illinois, Dr. Tapia, a licensed physician, had on June 15, 1961, examined the body of Willie Jones at the Cook County Morgue. The cause of Jones' death was a bullet wound which went through his chin and through his chest. The deceased's blood showed an alcohol content well below an amount which would have rendered him intoxicated or under the influence of alcohol. Dr. Tapia admitted that he had not performed the blood test himself, but had relied upon the toxicologist's report which had shown there was approximately 105 milligrams per cent of ethyl alcohol in deceased's blood, or 45 milligrams below an amount sufficient to intoxicate a person. He also testified that the amount of alcohol which would evaporate from a deceased person's blood between the time of death and the time of a blood sampling was negligible. When asked if he had, in his examination, noticed any scars or abrasions or marks around the head of the deceased, Dr. Tapia replied that the only thing he saw was the bullet wound of entrance and the bullet wound of exit in the chin.

**Testimony of Defense Witnesses:**

*John House,* the defendant, testified that he went to the Normal Pool Hall at about 8:30 p. m. Jones was arguing with one "Kilroy" because Kilroy was quitting playing. They were at the No. 3 table, and Jones was in a "frenzy." House took a pool stick from the rack and placed it on the No. 2 table; Brent took the rack off the balls, and House turned the light on over the table. House commenced playing with one "Shorty," and as he was preparing to make a shot Jones came alongside of House

and twisted the stick out of his arm. When House protested Jones asserted that he had paid for the use of that table; House replied that Jones had not paid for the use of the table, that the light had been out and the table had been vacant. House then said, "What's wrong? Are you mad at me because you lost a game of pool?" Jones said, "No, I ain't mad at you. But don't you mess with me, because if you mess with me I'll kill you." This surprised House; he "couldn't understand a man getting mad enough to say that he would kill another person over a pool game." House indicated disbelief to Jones, then saw that Jones had a pool stick which he held in a threatening manner. Jones pushed him back and asked if he was crazy; the spectators laughed at this remark, since House had pulled out a gun. Jones turned to the spectators and said that now House would have to kill him; then Jones charged at House and told him, "You got to kill me," to which House said that he did not have to kill him. As House got ready to leave, Jones came from behind and grappled with him; House had the gun in his hand, and figured that Jones was trying to get the gun from him. When Jones made a charge at House, House "slapped him . . . with the left hand . . . then . . . swung over at him with the pistol." House thought he struck Jones on the head, and the gun "went off after I swung at him." He was not holding the gun as a person normally does; he did not shoot intentionally. After the gun went off, Jones "smiled" at House. "Both of us were real surprised. So he smiles at me. I thought maybe the gun bullet had ricocheted some way. I didn't have no idea it hit him. I turned and walked out." House denied striking the victim more than once, denied initiating the argument, and denied having left the poolroom and returning twenty minutes later with the gun. He testified to being upset, and to leaving town after finding out that Jones was shot and killed. He stated that he was upset and panicky when he learned Jones had died, so two

days after the incident he left Chicago and went to California. In California he turned himself in; the police from Illinois came and arrested him on January 3, 1963, approximately one and a half years after the killing. The defendant emphasized in his testimony that he did not wilfully and feloniously shoot Jones, and that he felt his life was in danger when he used the pistol on the deceased.

It was brought out on cross-examination that the defendant had not actually seen Jones playing pool. He was uncertain about the time and durations of the time of some of the incidents leading up to the shooting. He testified that this was the first time he had ever owned a gun, that he "bought it from a fellow" three days before the shooting, that he did not register the gun, and that he taught himself to load the gun. It was demonstrated to the jury that the gun could not fire unless it was first cocked and then held with a finger on the trigger. Defendant testified that the gun was not cocked or ready for firing when he walked into the poolroom. He reiterated that the deceased had the pool stick raised, but then the defendant stated that the deceased had grabbed a pool ball, and that thereafter the defendant accidentally shot the deceased. However, the defendant testified that at the time he struck the deceased with the gun he had his finger on the trigger, and that at no time had he held the gun by the barrel and struck the deceased.

OPINION:

██ (1) On March 18, 1963, the Public Defender who had been appointed as attorney for defendant filed his appearance. On June 17, 1963, he was given leave to withdraw his appearance, and two other attorneys were allowed to file their appearance instanter as attorneys for the defendant, and the case was continued until July 26, 1963. On September 3, 1963, leave was granted

to the two attorneys to withdraw their appearance, and the court again appointed the Public Defender as counsel for defendant. The case was continued until October 7, 1963. On September 13, 1963, the Public Defender filed his appearance. On October 17, 1963, the defendant moved for a further continuance through his counsel, the Assistant Public Defender. At that time the court pointed out the various attorneys who had been representing the defendant, and that the case had been called nine times in court. The court thereupon denied any further continuance to the defendant. The reason the Assistant Public Defender gave in support of his motion for a continuance was that there were possible witnesses, and that the neighborhood where the deceased was killed was a "transient neighborhood." Under the circumstances, it cannot be said that the court abused its discretion in refusing to grant a further continuance. People v. Hannah, 54 Ill App2d 218, 203 NE2d 764; People v. VanNorman, 364 Ill 28, 2 NE2d 891.

■ (2) The defendant here argues that it was error to permit the jury to fix the punishment of the defendant. The criminal act was committed on June 14, 1961. The Code which was in effect at that time was the Criminal Code of 1874. The Criminal Code which was passed in 1961 became effective January 1, 1962. The Code of 1874 (Ill Rev Stats 1961, c 38, § 360) provided that "Whoever is guilty of murder shall suffer the punishment of death, or imprisonment in the penitentiary for his natural life, or for a term not less than fourteen years. If the accused is found guilty by a jury, they shall fix the punishment by their verdict; . . ." The defendant was tried and sentenced in the Circuit Court of Cook County on October 18, 1963. At that time the Criminal Code of 1961 was in effect. That Code provides (c 38, § 1-7):

353

(a) A person convicted of an offense shall be sentenced as provided in this Section.

(b) Upon conviction, the court shall determine and impose the penalty in the manner and subject to the limitations imposed in this Section.

(c) (1) Where, upon a trial by jury, a person is convicted of an offense which may be punishable by death, the jury may return a verdict of death. Where such verdict is returned by the jury, the court may sentence the offender to death or to imprisonment. Where such verdict is not returned by the jury, the court shall sentence the offender to imprisonment.

Section 9–1 provides:

A person convicted of murder shall be punished by death or imprisonment in the penitentiary for any indeterminate term with a minimum of not less than 14 years. If the accused is found guilty by a jury, a sentence of death shall not be imposed by the court unless the jury's verdict so provides in accordance with Section 1–7 (c) (1) of this Code.

Ill Rev Stats 1965, c 131, § 4, **Rights, etc., saved—Criminal cases,** is now in effect and was in effect both at the time of the criminal act and at the time of the sentence. It provides:

No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, for-

354

feiture or punishment so incurred, or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding. If any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect. This section shall extend to all repeals, either by express words or by implication, whether the repeal is in the act making any new provision upon the same subject or in any other act.

In Kossakowski v. The People, 177 Ill 563, 53 NE 115, the court quoted the above section. In that case the verdict of the jury fixed the punishment of the defendant at three years in the penitentiary and the court pronounced the sentence in accordance with the verdict. At the time of the commission of the criminal act the Act providing for the imposition of indeterminate sentences and for a system of parole was in effect. That Act was in effect at the time the trial court fixed the sentence. The court said:

". . . If the plaintiff in error was of opinion the manner of punishment provided by the parole system was more favorable to him than that provided by the law in force at the time of the commission of the offense, it was his privilege to have the provisions of such law applied by the court in his case, in accordance with the provisions of said section 4. He did not complain of the action of the jury in fixing a definite period of confinement in the penitentiary at the time of the rendition of the verdict, or in the motion for new trial, or when the sentence was pronounced. In the absence of any objection on his part it was competent to pronounce judgment

upon the verdict rendered in accordance with the requirements of the law at the time of the commission of the offense. See Johnson v. People, 173 Ill 131."

In the case before us, before the jury retired, the defendant, in person and through his attorney, elected that if the defendant was found guilty the jury should fix the terms of the punishment. The jury returned a verdict finding the defendant guilty, fixing the penalty at 35 years imprisonment in the penitentiary, and the court sentenced the defendant accordingly. As in the Kossakowski case, no point was raised by the defendant in his motion for new trial or motion in arrest of judgment. That case is controlling. The new Act did not mitigate the penalty. In both the Code of 1874 and the Code of 1961 the minimum imprisonment when the defendant was convicted of murder was 14 years. The trial court committed no error in sentencing the defendant as it did.

■■ (3) The evidence was sufficient to prove defendant guilty of the crime charged.

**DECISION:**

We find no error in the record and the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

DRUCKER, P. J. and ENGLISH, J., concur.